FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.
★ JUL 31 2012 ★
BROOKLYN OFFICE

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------- X
JOEL HIRSCHFELD,

      Plaintiff,

 -against-

METLIFE BANK, N.A.; DAVID S. HERN; and ALINE Y. DIXON,

      Defendants.
------------------------------------------------------------------- X

11-CV-3450 (ARR) (MDG)

OPINION & ORDER

ROSS, United States District Judge:

 Joel Hirschfeld ("plaintiff") brings the instant action for discrimination in mortgage lending under the Fair Housing Act ("FHA"), 42 U.S.C. §§ 3601-19, and the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1619-91f. He alleges that defendants Metlife Bank, N.A., David S. Hern, and Aline Y. Dixon (collectively "defendants") twice rejected his application for a mortgage to finance the purchase of a bungalow property on the grounds that the community in which it was located was composed almost entirely of Hasidic and other Orthodox Jews. Plaintiff contends that those loan denials constituted impermissible redlining and discrimination on the basis of faith and religious affiliation in violation of the FHA. He further alleges that defendants had a policy of refusing to extend loans to applicants seeking to purchase homes in residential or resort communities populated by members of a particular religion or other protected class and that this policy had a disparate impact on Orthodox Jews like plaintiff. Plaintiff seeks monetary, declaratory, and injunctive relief. Defendants have moved to dismiss plaintiff's amended complaint. For the reasons stated below, defendants' motion is denied.

1

# BACKGROUND[1]

Plaintiff, a member of the Orthodox, Hasidic Jewish faith, resides in Brooklyn, New York, where he has managed investments for his family's accounting firm for the past nine years. Am. Compl. ¶ 18. For several summers, he has rented a bungalow in the Infinity Estates Colony ("Infinity Estates"), a resort community located in the unincorporated hamlet of White Lake, New York. Id. ¶¶ 2, 4. The community is one of approximately two-hundred such "bungalow colonies" in the Catskills Mountains that are popular vacation spots for Orthodox Jewish families. Id. ¶ 3. Nearly all of the summer residents of Infinity Estates are Orthodox Jews, but the community is open to individuals of any race, religion, or nationality. Id. ¶ 4.

In December 2009, plaintiff was asked to become chairman of the board of directors of Infinity Estates, a position that required that he own a bungalow in the community. Id. ¶ 19. Already interested in purchasing a bungalow in any event, plaintiff entered into a contract to purchase one from an owner there. Id. In May 2010, plaintiff went through a mortgage broker to apply for a mortgage from MetLife Home Loans ("MetLife"). Id. ¶ 20. The requested mortgage of $113,000 would finance 80% of the sale price of the property, $142,000. Id. Plaintiff's financial circumstances qualified him as creditworthy for the loan, and no one at MetLife questioned plaintiff's financial qualifications for the loan. Id. ¶ 21.

An appraiser selected by MetLife evaluated the bungalow and researched comparable properties in nearby religious colonies. Id. ¶ 22. In a report dated August 31, 2010, he appraised the property at its selling price. Id.; Declaration of Beth L. Kaufman ("Kaufman Decl."), Ex. B.

---

[1] The facts are taken from the well-pleaded factual allegations in the complaint and from the mortgage loan documents attached to the complaint or otherwise provided to the court and upon which the complaint relies. See Rothman v. Gregor, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference, . . . and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing the suit." (internal citations omitted)).

In relevant part, an addendum to the appraiser's report stated:

> On the date of inspection as per the Management company there were no known units listed publicly for sale within similar residential communities or in any of the other residential religious resort developments within the County. Typically, sales of units in residential Religious Resort Communities in the region do not go through the local MLS services, they are sold or traded by word of mouth within their own communities. The appraiser visited the assessors office and reviewed the Town of Bethel and neighboring assessors with similar communities . . . and reviewed their sales books and found no other viable comparable sales similar to the subject.
>
> . . . . The appraiser notes Religious Resort Communities are common and accepted in the area and does not affect the subject[']s marketability. Due to the non general public inter dealings within the Religious Resort Community, sales and listing data are not made available through typical appraisal practices.

Kaufman Decl., Ex. B. The addendum noted that it had obtained sales data from the Infinity Condo Management Corp. Id. It stated that "[t]he range of single homes in the neighborhood ranges from a low $25,000 to a high $650,000 with the predominate range between $100,000 to $200,000," and it contained information on three comparable properties in the area that had sold for between $120,000.00 and $150,000.00 each. Id.

MetLife denied plaintiff's loan application in a document dated October 1, 2010. Am. Compl. ¶ 23. In that document, entitled "Underwriting Determination-Declination," the stated reason for denying plaintiff's loan application was "UNACCEPTABLE PROPERTY: INSUFFICIENT DATA – CLOSED COMMUNITY." Id. Defendant Aline Dixon ("Ms. Dixon") signed the declination form as the underwriter. Id.

When plaintiff's mortgage broker contacted MetLife to inquire further about the reason for the bank's denial of the loan, defendant David Hern ("Mr. Hern") and other MetLife representatives explained that the resort consisted entirely of Hasidic, Orthodox Jews and that, in the event of a default by plaintiff, it would be difficult to market the property to the general population. Id. ¶ 24. According a former MetLife account representative, MetLife had a policy

not to provide mortgages to individuals buying a home in any residential or resort community consisting largely of a single ethnic, religious, or other minority group. Id. In response, plaintiff's mortgage broker argued that denying the application on that basis was discriminatory and violated the law. Id. ¶ 25. The MetLife representatives responded that they would reconsider plaintiff's application for a mortgage but that, because time had passed since the initial appraisal, a new appraisal of the property would be required. Id.

Plaintiff thereafter again applied for a mortgage on the property, which an appraiser selected by MetLife again appraised at $142,000.00. Id. ¶¶ 27-28. The appraiser noted in his report that "anybody can buy into the Religious Resort Community if they cho[o]se to do so" and stated that the property's marketability was not affected by the fact that 99.9% of Infinity Estates was made up of a single interest group. Id. ¶ 29. In December 2010, defendants again denied plaintiff's loan application, in a document signed by Ms. Dixon and Mr. Hern, as underwriters. Id. ¶ 30. The stated reason for the declination was "UNACCEPTABLE PROPERTY – RELIGIOUS RESORT COMMUNITY/CLOSED COMMUNITY." Id. ¶ 30.

After the second loan declination, plaintiff's mortgage broker telephoned Mr. Hern and other MetLife representatives and told them that the denial constituted unlawful discrimination on the basis of religion. Id. ¶ 31. A few days later, plaintiff and his broker received a revised declination determination form signed by Mr. Hern. Id. ¶ 32. It indicated that the mortgage application had been denied because there were insufficient comparable properties to support the appraisal. Id. Sometime thereafter, a MetLife account representative who handled plaintiff's mortgage broker's account followed up with Mr. Hern and other employees about the reasons for defendants' denial of the second loan application. Id. ¶ 34. In an email, she noted that the broker had "submitted recent strong comps to have [the application] reconsidered" and warned

that plaintiff might file a lawsuit on the grounds that MetLife denied his loan application "for not lending in a mainly Jewish resort." Id. In an email by Mr. Hern, he stated, "[t]here is no chance that I would allow that type of verbiage to be communicated to anyone. That would be potential redlining and prejudicial." Id. ¶ 35. The precise "verbiage" to which Mr. Hern's email referred is not clear from the amended complaint. Id. ¶ 35.

The MetLife office that denied plaintiff's application was the New York and New England regional office of MetLife's residential mortgage lending division, located in Bedford, New Hampshire. Id. ¶ 9. Plaintiff contends that Ms. Dixon and Mr. Hern, in their respective capacities as an underwriter and the Manager of Wholesale Underwriting at that office, reviewed mortgage loan applications and "determined and/or recommended whether mortgage applications should be granted or denied." Id. ¶¶ 16-17. He alleges that all actions taken by Ms. Dixon and Mr. Hern "were in accordance with the specific authority granted to them by [MetLife] and were in furtherance of [MetLife]'s practices and policies." Id. ¶¶ 42, 57.

Plaintiff claims that executives and employees in the Bedford office "routinely made derogatory comments about Orthodox Jews and their integrity." Id. ¶ 37. Such comments included making fun of Jewish names to a MetLife account executive who dealt primarily with Orthodox Jewish mortgage brokers in Brooklyn and referring to an Orthodox Jewish account executive's Orthodox Jewish broker clients as "your people." Id. Additionally, on one occasion, a sales manager allegedly denied a loan application by an Orthodox Jew and commented, in sum and substance, that Orthodox Jews generally file false tax returns. Id.

On July 18, 2011, plaintiff commenced the instant action alleging that defendants' denial of his mortgage loan applications constituted actionable discrimination under the FHA and ECOA. He amended his complaint on October 11, 2011. Defendants thereafter moved to

5

dismiss the amended complaint in its entirety.

## DISCUSSION

Plaintiff alleges that defendants engaged in discriminatory housing practices made unlawful by sections 3605 and 3604(a) of the FHA. Section 3605 prohibits discrimination in real estate-related transactions, while Section 3604 pertains generally to discrimination in the sale or rental of housing. 42 U.S.C. §§ 3604, 3605. Plaintiff also alleges that he was denied credit on a discriminatory basis, as prohibited by the ECOA. Seeking dismissal of plaintiff's amended complaint, defendants argue that § 3604(a) of the FHA is inapplicable to mortgage lending services and that plaintiff's complaint fails to state a claim against the individual defendants under the ECOA. Defendants additionally contend that plaintiff's pleadings are insufficient on a number of other grounds. Defendant's arguments are unavailing.

### I. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must plead "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). This standard does not require "heightened fact pleading of specifics." Id. Instead, "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 555 U.S. 662, 678 (2d Cir. 2009). For the purposes of assessing a motion to dismiss, the court accepts the factual allegations in the complaint as true and construes them in a light most favorable to plaintiff, the non-moving party. See id. at 679 ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.").

In the context of discrimination claims analyzed using the McDonell Douglas burden-

shifting framework, "[t]he Iqbal plausibility standard applies in conjunction with . . . discrimination pleading standards." Jackson v. N.Y. State Dep't of Labor, 709 F. Supp. 2d 218, 223-24 (S.D.N.Y. 2010) (citation and internal quotation marks omitted); see Boykin v. KeyCorp, 521 F.3d 202, 204 (2d Cir. 2008). The Supreme Court "has rejected the concept that there is a heightened pleading standard" in discrimination cases, and, as such, there is no requirement that a complaint alleging discrimination "contain[] specific facts establishing a prima facie case." Lax v. 29 Woodmere Blvd. Owners, Inc., 812 F. Supp. 2d 228, 236 (E.D.N.Y. 2011) (citing Swierkiewicz v. Soreama N.A., 534 U.S. 506, 510 (2002)). Thus, an ECOA or FHA discrimination claim will survive as long as it provides "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a); Lax, 812 F. Supp. 2d at 236-37 (E.D.N.Y. 2011); see D. Carlyle Int'l LLC v. J.P. Morgan Chase & Co., 10 Civ. 6039, 2011 U.S. Dist. LEXIS 44754 (S.D.N.Y. Apr. 26, 2011).

## II. Section 3604(a) of the FHA Applies to Mortgage Lending Services

Section 3604 of the FHA prohibits discrimination in the sale or rental of housing. 42 U.S.C. § 3604. The specific subsection on which plaintiff seeks to predicate his suit, §3604(a), makes it unlawful "[t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." Id. § 3604(a). Defendants argue that "[b]y its terms, Section 3604(a) applies to selling, renting or making available a dwelling," and not to alleged discrimination in the provision of financial services. Defs.' Mem. at 5. They contend that reading § 3604(a) to encompass plaintiff's claims "would set a far-reaching precedent, expanding the scope of Section 3604(a) of the Fair Housing Act beyond its statutory language without the approval of Congress." Id. Defendants are mistaken.

Defendants are correct in asserting that statutory construction begins with the language of the statute and that, "where the statutory language provides a clear answer, it ends there as well." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999); Cervantes-Ascencio v. INS, 326 F.3d 83, 86 (2d Cir. 2003). However, the particular language at issue, which prohibits "otherwise mak[ing] unavailable or deny[ing]" a dwelling on the basis of a person's membership in a protected class, is not self-defining or otherwise clear on its face. As such, it is necessary to consider whether the denial of mortgage lending services, if done in a discriminatory manner, could "otherwise make unavailable or deny" housing to individuals who are seeking to rent or purchase property.

"The Supreme Court has repeatedly directed the courts to give a 'generous construction' to the Fair Housing Act." Hack v. President & Fellows of Yale College, 237 F.3d 81, 87 (2d Cir. 2000). As a practical matter, there is no doubt that a denial of mortgage lending services would likely result in the denial of housing to individuals who would otherwise purchase a home but do not have the funds to pay for it outright. In the contemporary world, obtaining mortgage financing is, for many buyers, a necessary condition for buying a property. Given this reality, even a fairly uncharitable construction of the statute would support interpreting the rejection of an application for mortgage financing services as a means of "mak[ing] unavailable or deny[ing]" a dwelling.

In this circuit, "[t]he phrase 'otherwise make unavailable' has been interpreted to reach a wide variety of discriminatory housing practices," including practices whose effect on the availability of housing is arguably more attenuated than the denial of mortgage financing. LeBlanc-Sternberg v. Fletcher, 67 F.3d 412, 424 (2d Cir. 1995). Section 3604 has, for example, been found to prohibit the discriminatory failure to pay out insurance proceeds. See Burrell v.

State Farm & Cas. Co., 226 F. Supp. 2d 427, 441-42 (S.D.N.Y. 2002). In considering the section's application to the alleged discriminatory provision of insurance, courts have reasoned that property insurance is instrumental to obtaining housing because lenders require it as a predicate to extending a mortgage. See id.; see also NAACP v. American Family Mut. Ins. Co., 978 F.2d 287, 297 (7th Cir. 1992) ("[Plaintiffs] contend that . . . lenders require their borrowers to secure property insurance. No insurance, no loan; no loan, no house; lack of insurance thus makes housing unavailable."); McDiarmid v. Economy Fire & Cas. Co., 604 F. Supp. 105, 107 (S. D. Ohio 1984) ("It is elementary that without insurance, mortgage financing will be unavailable, because a mortgage lender simply will not lend money on the property. Without mortgage financing, homes cannot be purchased."). Courts engaging in this line of reasoning have, thus, assumed the very premise that defendants ask the court to reject as irreconcilable with precedent: that mortgage financing has a significant role in making housing available.

Additionally, although courts in the Second Circuit have not addressed whether § 3604(a)'s "otherwise make unavailable" language specifically encompasses mortgage financing, every court to have reached this question has found that it does. See, e.g., Southend Neighborhood Improv. Asso. v. Cnty. of St. Clair, 743 F.2d 1207, 1209 (7th Cir. 1984) ("[A]lthough Section 3604(a) applies principally to the sale or rental of dwellings, courts have construed the phrase 'otherwise make unavailable or deny' in subsection (a) to encompass mortgage 'redlining.'"); Nat'l Cmty. Reinvestment Coalition v. Novastar Fin., No. 07-0861, 2008 U.S. Dist. LEXIS 73973 (D.D.C. Mar. 31, 2008) ("Given the broad purpose of the FHA, the broad language of the statute, and the precedent in the Circuit, this Court finds that 42 U.S.C. § 3604 applies to discrimination in the availability of mortgage financing."); Laufman v. Oakley Bldg. & Loan Co., 408 F. Supp. 489, 493 (S.D. Ohio 1976) ("The cost of housing being what it

is today, a denial of financial assistance in connection with a sale of a home would effectively 'make unavailable or deny' a 'dwelling.' When such denial occurs as a result of racial considerations, § 3604(a) is transgressed.").

In light of the breadth that courts have been instructed to give to provisions of the FHA, it is clearly appropriate to treat mortgage lending as a service that may "otherwise make unavailable or deny" dwellings to interested purchasers. Defendants offer no compelling arguments in support of adopting the narrow construction they ask to have imposed. Accordingly, the court holds that § 3604(a) of the FHA encompasses the discriminatory denial of mortgage financing.

### III. The Complaint Adequately States a Claim Against the Individual Defendants Under the ECOA

The ECOA prohibits discrimination in the extension of credit and provides that "it shall be unlawful for any creditor to discriminate against any applicant, with respect to any aspect of a credit transaction – (1) on the basis of race, color, religion, national origin, sex, or marital status, or age[.]" 15 U.S.C. §1691(a). The ECOA defines a creditor as "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit." Id. §1691a(e). The regulations promulgated under the ECOA define a creditor as "a person who, in the ordinary course of business, regularly participates in the decision of whether or not to extend credit, including setting the terms of credit." 12 C.F.R. § 202.2(l). Defendants assert that the ECOA claims should be dismissed as against the individual defendants because they are not creditors, as defined by the ECOA. Given plaintiff's allegations and the current posture of this case, the court cannot agree.

The ECOA and its regulations explicitly contemplate the liability of natural persons. See

15 U.S.C. § 1691a(f) (defining person as, inter alia, a natural person); 12 C.F.R. § 202.2(x) ("Person means a natural person, corporation, government or governmental subdivision or agency, trust, estate, partnership, cooperative, or association."). Although the bulk of cases brought under the ECOA have involved non-natural defendants only, see, e.g., Phillips v. Better Homes Depot, Inc., No. 02-CV-1168, 2003 U.S. Dist. LEXIS 27299, 66-67 (E.D.N.Y. Nov. 12, 2003), natural persons have also been deemed creditors under its anti-discrimination provisions. In Federal Trade Commission v. Capital City Mortgage Corporation, No. 98-237, 1998 U.S. Dist. LEXIS 22115 (D.D.C. July 13, 1998), the court declined to dismiss an individual defendant at the summary judgment stage on the ground that the term creditor included "those who participate in the decision to extend credit." Id. at *18. There, plaintiff maintained that the defendant, the president and owner of a mortgage corporation, "direct[ed], supervise[d], control[led], formulate[d], and participate[d]" in the acts and practices of the corporation, and there was evidence that the defendant signed documents as president and personally requested that certain forms be sent to him. Id. Similarly, the court in United States v. American Future Systems, Inc., 571 F. Supp. 551 (E.D. Pa. 1983), concluded that a company's chief operating officer was a creditor within the meaning of the ECOA where he "regularly participate[d] in determining policy for the extension of credit to all classification of customers." Id. at 560-61. It did not detract from his role as a creditor that he did not "personally or directly review each credit application" because the court found, as a factual matter, that the bulk of credit was "not generally extended based on a review of individual creditworthiness." Id. at 561.

Here, plaintiff alleges that the individual defendants were underwriters responsible for reviewing mortgage loan applications and determining or recommending whether they should be granted or denied. They signed the mortgage declination forms, and Mr. Hern spoke with

plaintiff's broker about the reasons for which the loan was denied. As such, the amended complaint pleads sufficient facts to support an inference that the individual defendants "regularly participate[d] in the decision of whether or not to extend credit, including setting the terms of credit," and were therefore creditors under the ECOA. 12 C.F.R. § 202.2(l). To the extent to which defendants argue, as a factual matter, that the individual defendants do not actually meet the definition of "creditor," such a determination is properly reserved for summary judgment. See Faber v. Metro. Life Ins. Co., 648 F.3d 98 (2d Cir. 2011) (stating that the court must assume all well-pleaded factual allegations to be true and draw all inferences in plaintiff's favor when assessing a complaint on a motion to dismiss).[2]

## V. The Amended Complaint Is Otherwise Adequately Pleaded

Defendants also attack the complaint on a variety of other unmeritorious grounds, mostly related to the amended complaint's purported pleading failures. These arguments consist principally of vague assertions that plaintiff's complaint is insufficient and conclusory and are predicated, in large part, on inaccurate descriptions of the documents before the court. For example, defendants assert that the loan appraisal documents establish that the property was deficient and that plaintiff, therefore, cannot show that the property was qualified to receive a mortgage. See Defs.' Mem. at 3; Defs.' Reply at 5-6. The loan appraisal documents establish that normal appraisal techniques were not available to assess the value of the bungalow, but those documents do not state that the property could not be appraised or that the alternative techniques used were inadequate. Indeed, those documents appraise the property at a value of

---

[2] Defendants' argument that, if the individual defendants are "creditors" under the ECOA, then plaintiff is not an "applicant" because he did not directly apply to them, individually, for credit is unavailing. A person is an "applicant" if he "applies to a creditor directly for an extension renewal or continuation of credit, or applies to a creditor indirectly by use of an existing credit plan for an amount exceeding a previously established credit limit." 15 U.S.C. § 1691a(b). The broad definition of "creditor" includes persons to whom an applicant would neither directly apply for credit nor indirectly apply for additional credit. There is, therefore, no basis upon which to read the definition of "applicant" as modifying the definition of "creditor."

12

$142,000.00. That defendants may have concluded that that the property was deficient because non-traditional appraisal techniques were used is a question of fact not yet established, and it cannot provide a basis for dismissing the complaint at this stage of litigation.[3] Similarly, defendants' argument that plaintiff has not pleaded a disparate impact claim and that "[t]he [c]omplaint contains no factual allegations that defendants discriminated against plaintiff" is, at best, specious. Defs.' Br. at 2. Plaintiff has provided documents that explicitly cite the religious character of the bungalow's community as a reason for declining a mortgage loan on the subject property, and the complaint alleges that MetLife employees made specific comments that may be viewed as disrespectful of Orthodox Jews. That plaintiff acknowledges, in his amended complaint, that defendants eventually revised their declination decision to remove its reference to the religious character of the community does not change this result.

## CONCLUSION

Defendant's motion to dismiss (Dkt. No. 20) is denied. Defendants' request for a stay (Dkt. No. 28) is deemed withdrawn in light of their subsequent correspondence. See Dkt. Nos. 30, 31. The parties shall proceed with discovery in this matter.

SO ORDERED.

S/Judge Ross

Allyne R. Ross

---

[3] Dismissal would be particularly inappropriate because the complaint would nonetheless be sustainable on a disparate impact theory. To establish a prima facie disparate impact claim, a plaintiff must show "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." Tsombanidis v. W. Haven Fire Dep't, 352 F.3d 565, 575 (2d Cir. 2003) (citations, internal quotations marks, and emphasis omitted). Defendants assert that plaintiff's mortgage application was rejected because there was insufficient information on comparable properties, but the appraisal documents attribute the difficulty of using traditional appraisal practices to the fact that comparable homes in the area are bought and sold primarily by word of mouth. Although not articulated in these precise terms, the factual allegations of the complaint therefore support liability on a theory of disparate impact, insofar as defendants' outwardly neutral practice of extending mortgages only for homes that can be appraised by typical methods could be expected to have a predictably disproportionate impact on members of religious communities whose homes are predominantly sold by word of mouth.

United States District Judge

Dated: July 31, 2012
Brooklyn, New York